NOTICE
Decision filed 03/25/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 240336-U

NO. 5-24-0336

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| SOUTHERN ILLINOIS HOSPITAL SERVICES, d/b/a Memorial Hospital of Carbondale, | ) ) ) | Appeal from the Circuit Court of Jackson County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) | No. 15-L-51 |
| Q.E.D. MEDICAL PHYSICS, INC., and CAREY MOSLEY, | ) ) ) ) | |
| Defendants | ) ) | Honorable Christy J. Solverson, |
| (Q.E.D. Medical Physics, Inc., Defendant-Appellant). | ) | Judge, presiding. |

JUSTICE CLARKE* delivered the judgment of the court.
Justices Boie and McHaney concurred in the judgment.

**ORDER**

¶ 1    *Held*: Where QED did not raise an argument in the circuit court, the argument was forfeited on appeal. Where privity did not exist between SIH and the parties to a prior federal criminal case, QED was not entitled to summary judgment on collateral estoppel grounds. Where there are remaining material questions of fact surrounding the application of an affirmative defense, QED was not entitled to summary judgment. Where there were remaining questions of fact surrounding the applicability of valid affirmative defenses to SIH's recovery, SIH was not entitled to summary judgment.

---

*Justice Moore was originally assigned to the panel prior to his retirement. Justice Clarke was substituted on the panel, has read the briefs, and listened to the oral argument.

1

¶ 2    The defendant-appellant, Q.E.D. Medical Physics, Inc. (QED), appeals from the February 17, 2022, order (1) denying its motions for summary judgment filed January 2, 2019, and June 23, 2020, respectively, and (2) granting Southern Illinois Hospital Services' (SIH) motion for summary judgment filed September 21, 2020. Additionally, QED appeals the denial of its March 21, 2022, motion to reconsider the February 17, 2022, order entered on October 24, 2022. An order of default was entered against defendant Carey Mosley in the circuit court on August 10, 2017, and he does not participate in this appeal.

¶ 3                               I. BACKGROUND

¶ 4    We limit our recitation of the facts to those relevant and necessary to understanding the major events of the case and, subsequently, to the disposition of this appeal. The plaintiff-appellee in this action is Southern Illinois Hospital Services, an Illinois corporation with its principal place of business located in Carbondale, Illinois, that provides treatment to patients through its medical facilities in southern Illinois. The defendant-appellant in this action is Q.E.D. Medical Physics, Inc., a Tennessee corporation with its principal place of business in Lebanon, Tennessee, that provides contractual medical physics and dosimetry services to hospital radiation oncology departments. Defendant Carey Mosley, who previously had a default judgment entered against him and does not participate in this appeal, was an employee of SIH and performed work as a contracted dosimetrist on behalf of QED at various hospitals in Kentucky and Tennessee.

¶ 5    Starting in 2002, QED licensed an internet-based timekeeping system called Journyx, which was used by QED's independent contractors to log the hours and work performed on behalf of QED. QED's bookkeeper would then retrieve the service hour data from Journyx and create a detailed monthly statement of fees entitled "Hours and Details Sorted by Date," which contained the date the charge was incurred, the type of charge it was (*i.e.*, work performed, travel expenses,

etc.), the name of the consultant who charged it, and the hours spent if applicable. These detailed statements of fees were sent to QED's clients along with an invoice that summarized the charges contained in the amount due for services rendered the previous month. The charges in the invoice were broken down by location, type of charge (physics work, travel time, *per diem*, etc.), hours charged, hourly rate charged, and total amount charged.

¶ 6    On January 1, 2003, SIH and QED entered into a contract with one another. Under the contract, QED was to provide up to 24 hours of physics services per week at SIH's Carbondale location. Additionally, there was an implied contract for QED to provide physics services at SIH's Marion location, and this contract did not contain a cap on hours. In return, SIH was to pay QED for the physicists' services at a rate of $125 per hour (along with an option to increase the hourly rate upon proper notice and within certain time constraints). Additionally, SIH was to pay QED for its consultants' travel time at one-half the physics rate, mileage, hotel accommodations, and *per diem* charges, if applicable. Further, under the contract, QED was to provide SIH with "a monthly report detailing all hours billed at each facility" (statement of fees) upon which SIH was to make payment for QED's services. Absent any dispute as to the accuracy of the statement of fees, SIH was then required to make payment within 15 days of receipt of the statement of fees.

¶ 7    In 2004, Mosley, a dosimetrist employed by SIH since 1998, became a part-time dosimetrist consultant providing fill-in dosimetry services for QED. In that part-time role, Mosley worked as a QED consultant providing *locum tenens* dosimetry services to hospitals in Tennessee and Kentucky. QED claims that it did not authorize, nor did Mosley perform, dosimetry services at SIH facilities. Meanwhile, SIH claims it was not made aware of Mosley's work on behalf of QED and the potential conflicts of interest that the work created. Later, in 2005, Mosley was promoted by SIH to become the director of SIH's radiation oncology department.

3

¶ 8    Starting in November of 2006 and continuing until July of 2013, Mosley made false time entries into QED's Journyx program, claiming that he performed dosimetry services on behalf of QED at SIH's Carbondale and Marion locations, services which both parties agree Mosley never actually performed. These false time entries were then included by QED's bookkeeper in QED's monthly statement of fees and correspondingly, were included in the total of the monthly invoice sent to SIH. As a QED consultant, Mosley knew that QED's president, Kim Working, did not review the statements of fees sent to clients unless a client questioned or complained of the charges. As head of SIH's radiation oncology department, Mosley was the party designated by SIH to review QED's statements of fees and invoices and approve them for payment by SIH's accounts payable department. Before approving the invoice and statement of fees for payment at SIH, Mosley would alter the statement of fees to remove his name and insert the name of one of QED's consultant physicists, making the statement of fees appear to reflect that QED charged SIH only for physics services. Based on the record before us, Mosley did not alter the invoice that was attached to the statement of fees. After altering the statement of fees, Mosley would then approve the invoice and the altered statement of fees and send the documents to the SIH accounts payable department for payment.

¶ 9    Beginning in November 2011, Mosley realized that he could further avoid detection and simplify his fraud by destroying the QED statement of fees and authorizing SIH accounts payable to pay on the basis of the monthly invoice alone. From November 2011 through July 2013, SIH paid QED based solely on the invoice, despite the contract requiring payment based on the detailed statement of fees. Once the invoice was sent to SIH Accounts payable, it was scanned into the SIH system by Lori Denny (office coordinator), sent to Debra Pedigo (accounting specialist) for processing, and the final checks were reviewed by Greg Wright (director of finance) and Diane

4

Anderson (director of accounting) prior to being sent out. At no point did SIH ever appear to dispute the invoice or statement of fees.

¶ 10    In July of 2013, SIH terminated Mosley's employment for charging personal expenses to SIH's corporate credit cards. Shortly after Mosley was fired, SIH noticed a dramatic reduction in QED's monthly invoices and statements of fees and began to investigate. In late 2013 and into early 2014, QED conducted an audit of its records and determined that, as a result of Mosley's fraud, QED had billed SIH $1,210,865 more than it should for the period of November 2006 through July 2013.

¶ 11    On March 12, 2014, Kim Working, the president of QED, sent an email to an employee of SIH, offering to disgorge $378,840 that QED had retained after paying Mosley $351,780 for the years 2010 through 2013 (QED believed the total stolen during that timeframe was $730,620) using a five-year payment plan. In addition to offering to repay SIH the amount QED retained, QED also offered to assist SIH in recovering $351,780 from Mosley, the amount he received from QED as payment for the hours billed. Based on the record, it does not appear that the offer contained any repayment for the time period of 2006 through 2009. SIH rejected QED's offer of repayment on those terms, and in April of 2014, the parties terminated their contractual relationship.

¶ 12    On June 15, 2015, SIH filed its original complaint against QED and Mosley in the Jackson County circuit court. SIH then filed its first amended complaint on October 5, 2016. Finally, on May 5, 2017, SIH filed its verified eight-count second amended complaint on which SIH now proceeds.

¶ 13    Count I alleged that QED had breached an express contract related to services performed in SIH's Carbondale facility, as QED billed more than the maximum number of weekly hours,

5

billed at a higher rate than permitted under the contract, and included charges for work not authorized or performed. Count II alleged that QED had breached an implied contract related to the Marion location in the same way it breached the express contract related to the Carbondale location. Count III alleged fraudulent concealment against Mosley, upon which Mosley was defaulted after he failed to answer. This count is not at issue in this appeal. Count IV alleged fraudulent misrepresentation in that QED knowingly submitted invoices and statements of fees that were false. Count V alleged direct liability against QED for negligent training, supervision, and retention of its employees in that QED, through its negligence in supervising its employees, allowed them to commit fraud against SIH. Count VI alleged vicarious liability against QED based on a theory that Mosley was QED's agent who committed fraud by altering the statement of fees or destroying them. Count VII alleged unjust enrichment against QED, alleging that QED received money it was not entitled to as a result of Mosley's fraud. Count VIII alleged unjust enrichment as to Mosley, alleging that Mosley received money from QED to which he was not entitled. As noted above, Mosley was defaulted in the circuit court and this count is not at issue in this appeal.

¶ 14    On May 31, 2017, QED filed its answer, its affirmative defenses, a cross-claim, and a counterclaim in response to SIH's verified second amended complaint. On August 15, 2017, in response to a motion made by SIH, the circuit court struck QED's answers as nonresponsive and ordered QED to file an amended answer within 30 days. On September 9, 2017, QED filed its verified amended answer, affirmative defenses, counterclaim, and cross-claim in response to SIH's verified second amended complaint. Of note to this appeal, QED's answer contained an admission that "Mosley's submission of the invoices with altered itemized time entries or no itemized time entries concealed material facts that could determine the propriety of the invoices."

6

¶ 15    In 2018, Mosley was criminally charged in a federal district court with wire fraud and mail fraud related to his scheme to defraud SIH. Mosley pled guilty to the charges. At the sentencing hearing, Mosley sought to use his efforts to assist SIH in proving that Working was complicit in the fraud as mitigation to lessen the sentence. At the conclusion of his sentencing hearing, Mosley was sentenced to 18 months in the federal Bureau of Prisons, 12 months' home confinement, a special assessment of $200, and restitution in the amount of $1,210,865 payable to SIH.

¶ 16    On January 2, 2019, QED filed a motion for summary judgment on the grounds that collateral estoppel applied in the case to bar SIH from bringing its claims against QED due to the federal judgment entered in Mosley's criminal case. In that motion, QED argues that because each of the counts in SIH's verified second amended complaint seeks recovery of losses sustained due to Mosley's fraud, and because full restitution was ordered to be paid by Mosley for that fraud, SIH was estopped from now bringing a claim against QED seeking restitution for that fraud as well. On February 11, 2019, SIH filed a response to QED's motion for summary judgment related to collateral estoppel, arguing that the issues that were litigated in the criminal case were different from those being litigated under SIH's verified second amended complaint, and therefore, collateral estoppel would not apply.

¶ 17    On June 23, 2020, QED filed another motion for summary judgment (also seeking, in the alternative, a summary determination of a major issue). In this motion, QED sought summary judgment on the grounds that the voluntary payment doctrine applied to bar all counts of SIH's verified second amended complaint, and that, in the alternative, QED's other defenses and the facts of the case established QED's right to judgment. On August 21, 2020, SIH filed a response to QED's motion for summary judgment based on the voluntary payment doctrine, arguing that the doctrine was inapplicable as Mosley's fraud meant that SIH lacked the knowledge required to

7

apply the doctrine against it. Additionally, SIH argued that QED's affirmative defenses did not entitle it to summary judgment, and neither did the undisputed facts of the case.

¶ 18     On September 21, 2020, SIH filed a combined motion for partial summary judgment on counts I and II, and for summary judgment on count VI. In support of its motion for partial summary judgment on counts I and II, SIH argued that the breach of contract elements previously identified by the court as outstanding were either satisfied or inapplicable, and therefore summary judgment was warranted. With respect to count VI, SIH argued that Mosley had undoubtedly committed fraud, that he acted as an agent of QED, and that QED failed to repudiate the benefits it received from Mosley's fraud. On October 30, 2020, QED filed its response to SIH's motion, arguing that it was entitled to summary judgment under its January 2, 2019, and June 23, 2020, motions for summary judgment, and therefore, SIH was not entitled to recover under any of the theories put forth in its motion.

¶ 19     On February 17, 2022, the circuit court issued its order on all three motions for summary judgment. The court began its order by denying QED's January 2, 2019, motion for summary judgment on the grounds of collateral estoppel, finding that the requirement of issue identicality was not present between the prior criminal case and the case QED sought to estop. The circuit court next denied QED's June 23, 2020, motion for summary judgment as to counts I, II, IV, V, and VI, finding that Mosley was QED's agent and that QED had failed to repudiate Mosley's conduct by disgorging the benefits of the fraud, and that, because QED's arguments in its motion had all been based on knowledge, QED was not entitled to summary judgment. The circuit court next granted QED's motion for summary judgment as to count VII, an issue not before us on appeal, finding that SIH was not entitled to relief under the principles of unjust enrichment where there was an express or implied contract.

8

¶ 20    The circuit court next granted SIH's partial motion for summary judgment on counts I and II, finding that the statement of fees and invoices that contained entries and charges for Mosley's services were a breach of contract. The circuit court further found that the fraud exception to the voluntary payment doctrine applied as "there is no dispute that Mosley's actions were fraudulent, indeed, Mosley admitted his fraud and pled guilty to his conduct in the federal criminal case." The circuit court reasoned that because Mosley's fraud harmed SIH, Mosley's knowledge of the fraudulent nature of the invoices was not attributable to SIH. Further, the court reasoned that because SIH did not have any other agents with actual knowledge of the fraud at the time it was occurring, the fraud exception to the voluntary payment doctrine applied, and SIH was not barred from recovery under its breach of contract theories.

¶ 21    Finally, the circuit court granted SIH's motion for summary judgment on count VI, finding that QED was vicariously liable for Mosley's fraud. The court found that Mosley was QED's agent as QED admitted in its answer that Mosley was a consultant, and that QED consultants were either "officers, employees or agents" of QED. The court reasoned that a principal is always bound by the fraudulent acts of their agent acting within the scope of their agency unless they repudiate the fraud. The circuit court found QED's offer seven years prior repudiating only a portion of the money fraudulently taken from SIH was insufficient to repudiate the fraud and therefore found that QED was liable for Mosley's actions.

¶ 22    On March 21, 2022, QED filed with the court a motion to reconsider the February 17, 2022, order. In its motion to reconsider, QED argued that the circuit court had made errors in applying the existing law to the case. Specifically, it argued that (1) SIH accounts payable had also breached the contract by not paying based on the statement of fees but on the invoices alone, (2) QED had no knowledge of Mosley's fraud, (3) QED had attempted to repudiate and voluntarily disgorge

9

any profits received from SIH as a result of the fraud, (4) the court had accepted an overbroad theory of the fraud exception to the voluntary payment doctrine put forth by SIH's counsel when it declined to apply the doctrine, and (5) the court should have applied collateral estoppel as SIH had previously sought, and was awarded, a restitution judgment for the entire loss in the federal criminal case against Mosley. In the alternative, QED also sought a Rule 304(a) finding (Ill. S. Ct. R. 304(a) (eff. Mar. 8, 2016)) that there were questions of law ripe for immediate appeal.

¶ 23    On April 27, 2022, SIH filed its response to QED's motion to reconsider, wherein, SIH argued that QED failed to meet the requirements of a motion to reconsider. Additionally, SIH argued that the circuit court properly found (1) that QED breached the contract, (2) that Mosley was an agent of QED, (3) that the voluntary payment doctrine did not apply, (4) that collateral estoppel was inapplicable, and (5) that QED's offer to repudiate was incomplete.

¶ 24    On October 24, 2022, the circuit court denied QED's motion to reconsider. In its order, the court began by reiterating that it applied the collateral estoppel factors, and, after evaluating them, found that it would be inequitable to apply the doctrine because the issues between the cases were non-identical as SIH had not litigated QED's potential involvement in the fraud in any jurisdiction. Next, the circuit court reiterated that it found that the "knowledge of the payor" is the dispositive factor under the voluntary payment doctrine, and it found that SIH lacked the knowledge required to apply the doctrine as a result of Mosley's fraud. Thus, it found the fraud exception to the voluntary payment doctrine applied. Finally, the circuit court reiterated its finding that QED ratified Mosley's fraudulent conduct "by retaining the funds after learning they were obtained from Mosley's fraud" and therefore, QED was vicariously liable for that fraud as well. The circuit court also declined to grant QED's request for alternative relief of 304(a) certification for questions of

law, finding that the questions QED wished to certify for appeal were either based on the application of specific facts in the case or would otherwise not materially advance the litigation.

¶ 25 On February 6, 2024, after further litigation had occurred, QED filed a motion for a 304(a) finding requesting that the court allow QED to appeal (1) the February 17, 2022, order denying QED's January 2, 2019, motion for summary judgment on collateral estoppel and QED's June 23, 2020, motion for summary judgment on counts I, II, IV, V, and IV; (2) the February 17, 2022, order granting SIH's September 21, 2020, motion for partial summary judgment on counts I and II, and SIH's September 21, 2020, motion for summary judgment on count VI; and (3) the October 24, 2022, order denying QED's motion for reconsideration of the February 17, 2022, orders.

¶ 26 On March 4, 2024, the circuit court granted QED's request for a 304(a) finding. On March 6, 2024, QED filed its notice of appeal in this case.

¶ 27                                          II. ANALYSIS

¶ 28 On appeal, QED claims that the circuit court committed reversible error in its February 17, 2022, order in which the circuit court denied QED's two motions for summary judgment and granted SIH's motion for summary judgment. QED also claims that the circuit court's October 24, 2022, denial of QED's motion to reconsider the February 2022, order was in error.

¶ 29 Specifically, QED argues that the circuit court committed reversible error when the circuit court denied QED's motions for summary judgment filed January 2, 2019, and June 23, 2020, as QED argues that judicial and collateral estoppel prevent SIH from bringing this case and, in the alternative, the voluntary payment doctrine prevents SIH from recovering against QED. QED also appeals the circuit court's grant of SIH's September 21, 2020, motion for summary judgment on the grounds that even if QED is not entitled to summary judgment, there are remaining questions of material fact that would preclude SIH from receiving summary judgment.

11

¶ 30    We begin our analysis by noting that an appeal of summary judgment is subject to *de novo* review. *Seymour v. Collins*, 2015 IL 118432, ¶ 42. Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Id.* Summary judgment is a drastic measure and should only be granted if the movant's right to judgment is clear and free from doubt. *Id.* Where a reasonable person could draw divergent inferences from undisputed facts, summary judgment should be denied. *Id.* On a motion for summary judgment, the trial court has a duty to construe the record strictly against the movant and liberally in favor of the nonmoving party. *Id.* As a result, summary judgment is not appropriate: (1) if "there is a dispute as to a material fact," (2) if "reasonable persons could draw divergent inferences from the undisputed material facts," or (3) if "reasonable persons could differ on the weight to be given the relevant factors" of a legal standard. (Internal quotation marks omitted.) *Id.*

¶ 31                     1. QED's Motion for Summary Judgment—Estoppel

¶ 32                              A. *Judicial Estoppel*

¶ 33    On appeal, QED's first argument related to the denial of its January 2, 2019, motion for summary judgment is that the circuit court erred when it declined to apply the doctrine of judicial estoppel and dismiss the case. Because QED was the party seeking summary judgment on this count, we must construe the record strictly against it, and liberally in favor of SIH. *Id.* "Judicial estoppel applies in a judicial proceeding when litigants take a position, benefit from that position, and then seek to take a contrary position in a later proceeding." *Id.* ¶ 36. Thus, "[j]udicial estoppel is an equitable doctrine invoked by the court at its discretion." *Id.* As the Illinois Supreme Court has observed, "the uniformly recognized purpose of the doctrine is to protect the integrity of the judicial process by prohibiting parties from 'deliberately changing positions' according to the exigencies of the moment." *Id.*

¶ 34    In order for the doctrine of judicial estoppel to apply, the Illinois Supreme Court has found that there are five prerequisites that generally must be present. *Id.* ¶ 37. They are (1) the party to be estopped must have taken two different positions, (2) that are factually inconsistent, (3) in separate judicial or quasi-judicial administrative proceedings, (4) intending for the trier of fact to accept the truth of the facts alleged, and (5) have succeeded in the first proceeding and received some benefit from it. *Id.*

¶ 35    On appeal, QED claims that all of these elements are met, and judicial estoppel should apply because (1) SIH previously took the position that Mosley was responsible for the fraud in the federal criminal case, (2) but SIH here argues that QED was the party responsible for the fraud, (3) that these inconsistencies were in separate cases (one was argued in federal court, the second was argued in state court), (4) SIH has made these arguments intending for the courts to act on them, and (5) that SIH benefited from the federal judgment through the restitution order that was entered only against Mosley and not QED.

¶ 36    However, prior to addressing the matter on the merits, we note that "[g]enerally, arguments not raised in the circuit court are forfeited and cannot be raised for the first time on appeal." *Gunnison Commons, LLC v. Alvarez*, 2024 IL App (1st) 232176, ¶ 23. QED failed to raise the argument of judicial estoppel in its January 2, 2019, motion for summary judgment. Additionally, the record on appeal does not contain a report of proceedings from the hearing that was conducted on this motion; thus, the record is devoid of any arguments that may have been raised at the hearing. Because incompleteness of the record is construed against the appellant, we must assume judicial estoppel was not argued. See *Ittersagen v. Advocate Health & Hospitals Corp.*, 2021 IL 126507, ¶ 52. Finally, judicial estoppel is not found in the order of the court or the denial of the motion to reconsider. Instead, our review of the record reveals that judicial estoppel was not raised

13

in connection with the summary judgment proceedings and first appeared in QED's amended affirmative defenses, which were filed more than a year and a half after the order denying summary judgment was entered. Accordingly, because this issue was not presented to the circuit court and is raised for the first time on appeal, it is forfeited. Moreover, the record contains no factual basis upon which to evaluate the argument.

¶ 37                                    B. *Collateral Estoppel*

¶ 38     QED's second argument related to the denial of its January 2, 2019, motion for summary judgment is that the court erred when it found that collateral estoppel did not apply to bar SIH's second amended complaint. The Illinois Supreme Court laid out the doctrine of collateral estoppel in *Talarico v. Dunlap*, 177 Ill. 2d 185, 191 (1997), where it stated:

>      "Collateral estoppel is an equitable doctrine. Application of the doctrine precludes a party from relitigating an issue decided in a prior proceeding. [Citation.] Offensive use of collateral estoppel occurs when a plaintiff seeks to foreclose a defendant from litigating an issue the defendant has previously litigated unsuccessfully in another action. Defensive use of the doctrine occurs when, as in this case, a defendant seeks to prevent a plaintiff from asserting a claim the plaintiff has previously litigated and lost. [Citation.]
>
>      The minimum threshold requirements for the application of collateral estoppel *** are: (1) the issue decided in the prior adjudication is identical with the one presented in the suit in question, (2) there was a final judgment on the merits in the prior adjudication, and (3) the party against whom estoppel is asserted was a party or in privity with a party to the prior adjudication. A previous requirement of 'identical-parties-mutuality' has been eliminated."

14

¶ 39 In making its argument that collateral estoppel should apply to block SIH's second amended complaint, QED claims that (1) the restitution claims are identical between the federal case and this case and therefore they share operative facts that were all pled as part of the federal restitution judgment, (2) Mosley's plea in his federal case was a final judgment on the merits, and (3) that "SIH was in privity with the judgment debtor, Mosley," because SIH was in privity with him throughout the timeframe when the fraudulent acts were being committed as Mosley was an employee of SIH.

¶ 40 In response, SIH argues that (1) the issues that must be litigated here are different than those in the criminal case, as the counts in SIH's complaint require different findings of fact than the ones litigated in the criminal case against Mosley, and (2) there is no privity of interest between SIH in the current case and Mosley in the criminal case, as the interests of the parties must be aligned and they cannot be here where Mosley defrauded SIH.

¶ 41 In declining to grant QED summary judgment, the circuit court found that in the federal criminal case what was litigated was the issue of whether Mosley was guilty of fraud. It found that at no time was the question of whether another party participated in or benefited from the fraud answered. Additionally, it found that the federal court never addressed whether QED breached its contracts with SIH, which is another question in this case. Therefore, it found collateral estoppel inapplicable.

¶ 42 We begin our analysis of this claim of error by examining the third element required for collateral estoppel to apply, the privity between the party to be estopped and a party involved in the prior litigation. Specifically, we note that "[p]rivity *** exists when parties adequately represent the same legal interests, irrespective of their nominal identities. [Citations.] Thus, '[a] nonparty may be bound pursuant to privity if his interests are so closely aligned to those of a party

15

that the party is the "virtual representative" of the nonparty.' " *Ovnik v. Podolskey*, 2017 IL App (1st) 162987, ¶ 29.

¶ 43 On appeal, because QED was the party seeking summary judgment on this count, we must construe the record strictly against it, and liberally in favor of SIH. *Seymour*, 2015 IL 118432, ¶ 42. In its argument, QED claims that SIH's interest in this case is so closely aligned with Mosley's interest in the federal criminal proceeding that we should estop SIH from being able to bring these claims against QED as they were already litigated by Mosley in the other case. We decline to do so. As mentioned above, in making its argument, QED points to Mosley and SIH having had an employer-employee (principal-agent) relationship during the time the fraud against SIH was being conducted. However, we note that "[w]hen an agent, by his self-serving conduct, so abandons his principal's interests as to act adversely to those interests, or worse, to act in fraud of his principal, it can fairly be said that pro tanto, the agency really cease[s]." (Internal quotation marks omitted.) *McRaith v. BDO Seidman*, *LLP*, 391 Ill. App. 3d 565, 590 (2009). SIH and Mosley's agency relationship cannot establish privity regarding the fraud as their interests on the fraud are diametrically opposed. SIH's greatest interest in litigation related to the fraud is maximizing its recovery of funds it was defrauded. Meanwhile, Mosley's interest is in minimizing the punishment he receives, including minimizing the amount of restitution he must pay to SIH.

¶ 44 Additionally, there is no privity between SIH and the federal prosecutor because the prosecutor's job is to seek justice, while SIH's is, as previously stated, to maximize its own recovery of stolen funds. Therefore, because there is no congruence of interest such that any party's interests are identical to SIH's in the federal criminal case, there is no privity between SIH and either of the parties to the federal criminal case, and collateral estoppel is inappropriate. Thus, the circuit court did not err in denying summary judgment on this issue.

16

¶ 45        2. QED's Motion for Summary Judgment—Voluntary Payment Doctrine

¶ 46    QED next appeals the denial of its June 23, 2020, motion for summary judgment, where in it sought summary judgment on counts I, II, IV, V, VI, and VII of SIH's second amended complaint on the grounds that the circuit court improperly found that the voluntary payment doctrine did not apply to bar SIH's claims against QED. Because QED was the party seeking summary judgment on this count, we must construe the record strictly against it and liberally in favor of SIH. *Seymour*, 2015 IL 118432, ¶ 42.

¶ 47    In support of its position that the circuit court erred in denying its motion for summary judgment, QED asserts that all of the invoices were voluntarily paid by SIH and included on the face of the invoice the number of service hours per week for which QED was seeking payment. QED further argues that the fraud exception does not apply, because, under the voluntary payment doctrine, the operative question was whether the fraud concealed from SIH that the payment demanded exceeded that allowed by the contract, and further argues that none of Mosley's alleged fraud affected the number of hours reflected on the face of the invoices submitted for payment. Although the line items contained in the accompanying statements of fees were allegedly altered, the invoices themselves were not. Thus, according to QED, Mosley's conduct did not conceal the material fact that the invoices sought payment for hours exceeding the amount permitted under the contract. Thus, QED argues, it would still be possible for SIH to tell the claim was for money to which QED was not entitled due to the number of hours for which QED was claiming payment.

¶ 48    In other words, QED argues that because the number of hours QED claimed it was entitled to be paid was in excess of the 24-hours-per-week cap in the parties' contract, and that claim for more than 24-hours-per-week was clearly evident on the face of the invoice, the fraud exception does not apply as SIH had an obligation to dispute the invoice and not rely on QED's assertion

17

that the invoice was correct. QED argues that nothing prevented SIH from determining that the payment sought by QED was for, or included, hours over the contractual limit since it was evident on the face of the invoice. Therefore, it argues, the voluntary payment doctrine should apply to bar all claims to recover the money paid to QED under its invoice.

¶ 49    In response, SIH argues that the court did not err in finding that the voluntary payment doctrine was inapplicable as a matter of law in this case because the voluntary payment doctrine requires knowledge of facts related to the payment. SIH claims that the fraud relevant to this doctrine is not in the billing statement, invoice, or misstatement of the number of hours. Instead, it argues that the fraud that triggers the exception to the voluntary payment doctrine was in Mosley's approval of the billing statement as director of oncology and his subsequent direction to SIH's accounts payable to issue payment on the invoice.

¶ 50    Specifically, SIH argues that the fraud committed in approving the invoices meant that SIH does not have knowledge that the invoices reflected charges greater than 24 hours per week. It argues that because Mosley is not an agent of SIH due to the fraud he committed against it, his knowledge that the payment was for actions in breach of contract cannot be imputed to SIH. Further, because SIH's corporate policy was that Mosley was the only person to review the statement, no one else at SIH has, or would have, the requisite knowledge of the breach. Therefore, SIH argues, the fraud deprived SIH of the knowledge required to apply the voluntary payment doctrine.

¶ 51    In evaluating the parties' arguments, we note that the Illinois Supreme Court summarized the voluntary payment doctrine as it exists in Illinois in *McIntosh v. Walgreens Boots Alliance, Inc.*, 2019 IL 123626, ¶¶ 22-24, where it stated:

18

"The common-law voluntary payment doctrine embodies the ancient and 'universally recognized rule that money voluntarily paid under a claim of right to the payment and with knowledge of the facts by the person making the payment cannot be recovered back on the ground that the claim was illegal.' [Citations.]

To avoid application of this long-standing doctrine, it is necessary to show not only that the claim asserted was unlawful but also that the payment was not voluntary, such as where there was some necessity that amounted to compulsion and payment was made under the influence of that compulsion. [Citations.]

In addition to compulsion or duress, other recognized exceptions to the voluntary payment doctrine include fraud or misrepresentation or mistake of a material fact. [Citations.]"

It went on to state that "[t]o avoid application of the doctrine, a plaintiff must allege facts that bring the claim within one of the recognized exceptions such as necessity or compulsion, fraud, or misrepresentation or mistake of fact." *Id.* ¶ 34.

¶ 52    This court, in *Harris v. ChartOne*, 362 Ill. App. 3d 878, 882 (2005), explained that where "the facts were not obscured or inaccessible but, rather, [where] the plaintiff's lack of knowledge could be attributed to its lack of investigation into the defendant's claim of liability and the basis upon which the defendant was seeking the [payment]" that the plaintiff's lack of knowledge was "no exception to the voluntary-payment doctrine." Thus, this court ruled that the plaintiff could not establish the required mistake of fact or fraud required to trigger the exceptions to the voluntary payment doctrine.

¶ 53    Similarly, in *Jursich v. Arlington Heights Federal Savings & Loan Ass'n*, 110 Ill. App. 3d 847, 852-53 (1982), the Second District held:

19

"The crux of plaintiff's complaint is that defendant misrepresented to plaintiff the due date upon which late payment fees could be assessed under the mortgage and note. However, a party having full knowledge of the facts, and access to a written instrument, may not reasonably rely on representations of other contracting parties respecting the effect of the written instrument. [Citations.] Plaintiff was a party to the note and thus was not at liberty to accept defendant's allegedly false construction of the terms of the mortgage and note. He did so at his peril, inasmuch as the erroneous interpretation of a contract constitutes a mistake of law [citation], for which the law affords no remedy."

¶ 54 Taken together, *Harris* and *Jursich* make clear that SIH could not simply rely on a belief that an invoice was correct, voluntarily pay it, and later claim ignorance of a breach of contract where the written instrument governing the transaction at the time payment was made, on its face, disclosed the very breach now complained of. Rather, to invoke the fraud exception to the voluntary payment doctrine, the alleged fraud must have deprived the payor of knowledge of the material facts at the time payment was made. Here, the operative fact that would need to have been concealed from SIH to deprive it of knowledge is that QED's invoices sought payment for hours exceeding the 24-hour weekly limitation imposed by the parties' contract.

¶ 55 Thus, the question becomes what knowledge may properly be attributed to SIH at the time the payments were made. In Illinois, a corporation is an artificial legal entity, and the only knowledge it can be said to have is that imputed to it under principles of agency law. *Campen v. Executive House Hotel, Inc.*, 105 Ill. App. 3d 576, 585-86 (1982). Thus, knowledge which a corporate agent receives while acting within the scope of his or her agency is imputed to the corporation if the knowledge concerns a matter within the scope of the agent's authority. *Id.* at 585; see also *St. Paul Mercury Insurance Co. v. Statistical Tabulating Corp.*, 155 Ill. App. 3d 545,

20

550 (1987) (it is well established that business knowledge acquired by an agent in the natural scope of his employment is imputed to the principal). Once an agent's knowledge is imputed to a corporation, the imputed knowledge is not affected by changes in the corporation's personnel. *Campen*, 105 Ill. App. 3d at 586.

¶ 56    SIH argues that Mosley's knowledge of the fraud cannot be imputed to SIH under agency principles because Mosley's actions were self-serving and intended to defraud SIH. This contention finds support in *McRaith*, which held that "when a corporate officer or agent engages in fraudulent conduct for the distinctly private purpose of lining his own pockets at his corporation's expense, it is unlawful, as well as illogical, to impute the agent's guilty knowledge or disloyal, predatory conduct to his corporate principal." (Internal quotation marks omitted.) *McRaith*, 391 Ill. App. 3d at 590. Accordingly, we agree that Mosley's knowledge cannot be imputed to SIH. As *McRaith* makes clear, when an agent (here Mosley) acts adversely to the interests of the principal (SIH) by committing fraud against the principal, the agency relationship is terminated, and the rogue agent's knowledge may not be imputed to the principal.

¶ 57    However, Mosley is not the only agent by whom SIH could have institutional knowledge of QED's breach of contract. Because a corporation's knowledge is composed of the knowledge of its agents, past and present, we must consider whether any SIH employee other than Mosley possessed knowledge that QED's claim for payment was inconsistent with the contract at the time the payments were made. To have knowledge that QED's claim of right to payment was a breach of contract, SIH must have an agent or agents (the knowledge is not required to be found in the same person) who knew (1) that the terms of the contract limited payment to 24 hours per week at $125 per hour; and (2) that QED sought payment for hours exceeding that weekly limitation and, starting October 2008, at a rate greater than $125 per hour.

21

¶ 58    It is clear upon a review of the record in this case that there are agents of SIH, other than Mosley, who had knowledge of QED's contract with SIH. Thus, the remaining question is whether SIH knew or should have known that QED's invoices sought payment for hours in excess of the 24-hour-per-week limitation. To that end, QED made a judicial admission in its verified amended answer to SIH's verified second amended complaint that "Mosley's submission of the invoices with altered itemized time entries or no itemized time entries concealed material facts that could determine the propriety of the invoices." See *Gaines v. Ciox Health, LLC*, 2024 IL App (5th) 230565, ¶ 35 (a fact admitted in a verified pleading is considered a judicial admission, conclusive against the pleader, and dispenses with proof on that fact). However, QED here argues that the unaltered invoice itself, regardless of the fraudulent alterations to the statement of fees, contained sufficient information for SIH to determine the propriety of the invoices.

¶ 59    If, for example, the undisputed facts established that Mosley altered *both* the invoices and accompanying statement of fees in a manner that concealed the material facts necessary to determine whether QED's billing complied with the contract, then the fraud exception to the voluntary payment doctrine would apply as a matter of law because SIH would lack knowledge of the material facts demonstrating the payments violated the contract. However, the record does not establish that Mosley's actions concealed all such information. While Mosley altered the itemized time entries contained in the accompanying statement of fees, QED asserts that the face of the invoices themselves remained unchanged. According to QED, the monthly invoices listed the total number of hours billed by location along with the applicable hourly rate. Moreover, Mosley's alterations are not alleged to have changed the total hours reflected on the monthly invoices. Further, while payment was supposed to be made on the itemized statement of fees, starting in November of 2011, SIH began paying on the invoice alone, an action which itself was a breach of

22

the contract by SIH, meaning for this time period, the QED invoice is the only document that matters for determining SIH's knowledge.

¶ 60   In its verified second amended complaint, SIH makes a judicial admission (see *Gaines*, 2024 IL App (5th) 230565, ¶ 35) that "following Mosley's approval of QED's invoices and submission of the invoices to accounts payable, SIH issued payment directly to QED." Thus, SIH admits two things: (1) that the SIH accounts payable department received the approved invoice and (2) that SIH accounts payable paid QED based on the information contained in these invoices. As noted above, both the total number of hours and the hourly rate of pay were listed on the monthly invoices sent to accounts payable (which were over 24 hours per week and, after October 2008, over $125 per hour) and are not alleged to have been falsified as a result of Mosley's fraudulent alterations to the statement of fees. Instead, Mosley's alterations are only alleged to have changed the itemized time entries on the accompanying statement of fees to hide his name and the fact that the inflated hours were for dosimetry work, not physics services.

¶ 61   Accordingly, the invoices themselves contained information that could have revealed at least two of the three alleged contractual breaches: (1) billing for hours exceeding the 24-hour weekly limitation and (2) billing at a rate greater than $125 per hour after October 2008. (It would not have revealed (3) that the charges reflected unperformed dosimetry services where only physics services were permitted under the contract.) Thus, the invoices on their face contained information from which SIH's accounts payable department could potentially determine that QED's claims for payment exceeded the contractual limitations throughout most, if not all, of the period of time SIH now seeks to recoup payments for.

¶ 62   In summary, we agree with the circuit court that "[i]n the case at bar, there is no evidence that anyone at SIH was aware of Mosley's fraud (except for Mosley), because Mosley either altered

23

or destroyed the billing statements that contained his name." However, there is also evidence that Mosley's fraud did not conceal or obscure the total number of hours or the hourly rate listed on the face of the monthly invoices paid by the SIH accounts payable department. Additionally, we note that the total hours and rate listed on the face of the monthly invoices that SIH accounts payable paid, and upon which SIH now seeks repayment, were more than the hours and rate specified in the contract.

¶ 63    Thus, although the record contains evidence via QED's judicial admission that Mosley's fraud concealed certain material facts that could determine the propriety of the invoices, there is also evidence that other material information—specifically, the total hours billed and the applicable hourly rate—remained visible on the face of the invoices. In addition, there is no evidence that Mosley's fraud caused SIH to adopt a system in which its accounting department relied solely upon the approval of department managers or paid invoices without reviewing the information contained on the invoices themselves. Nor does the record establish that Mosley caused SIH to abandon the contractual requirement that payments be based upon an itemized statement of services.

¶ 64    Therefore, we find genuine issues of material fact remain regarding the applicability of the voluntary payment doctrine in this case. These include whether the monthly invoices received by SIH's accounts payable department contained sufficient information for SIH's agents to determine whether QED's claims for payment exceeded the contractual limitations. Specifically, questions remain as to: (1) whether the invoices reflected sufficient information for SIH to determine that the hours billed exceeded the contract's 24-hour-per-week cap, particularly where the invoices and statements of fees reflected monthly totals rather than weekly entries; (2) whether the invoices contained sufficient information to determine that the hours billed for services performed at the

24

Marion location constituted a breach of contract, given that the Marion location operated under an implied contract that did not contain the same hourly limitation as the contract governing the Carbondale location; (3) whether the invoices reflected that, beginning in October 2008, QED billed SIH at a rate exceeding the $125 hourly rate permitted under the contract, or whether SIH had been properly notified of a contractual rate change; and (4) if the invoices contained sufficient information to place SIH on notice of a contractual breach, the point in time at which such notice arose and the extent to which the voluntary payment doctrine would bar recovery of payments made thereafter. Because we find there are operative questions of material fact, we find that the circuit court did not err in denying QED's second motion for summary judgment filed June 23, 2020, as QED is not entitled to summary judgment.

¶ 65                 3. SIH's Motion for Summary Judgment—Counts I, II, & VI

¶ 66     Finally, QED appeals the circuit court's decision to grant SIH's September 21, 2020, motion for summary judgment, wherein SIH sought partial summary judgment on counts I and II, as well as summary judgment on count VI of SIH's second amended complaint on the grounds that the circuit court improperly found that no questions of material fact remained. Because SIH was the party seeking summary judgment, we must construe the record strictly against it and liberally in favor of QED. *Seymour*, 2015 IL 118432, ¶ 42.

¶ 67     On appeal, QED argues that, if it is not entitled to summary judgment there are then still several remaining questions of fact that must be answered, including whether SIH had a duty to mitigate damages and whether Mosley was an agent of QED when he committed his fraudulent conduct, before SIH is entitled to summary judgment, and therefore the circuit court abused its discretion in granting summary judgment. In response, SIH argues that its duty to mitigate began when it discovered Mosley's fraud, which it did by trying to recover the funds, that Mosley was

undoubtedly an agent of QED when he committed the fraud, and that QED failed to repudiate the agency relationship by disgorging the fraudulently obtained benefits it received after it learned of the fraud.

¶ 68    In evaluating SIH's claim of right to summary judgment, we note that where there is a valid defense to a plaintiff's recovery, summary judgment is inappropriate. See *Diversey Liquidating Corp. v. Neunkirchen*, 370 Ill. 523, 527 (1939) ("The purpose of a proceeding for summary judgment is to determine whether a defense exists. Where a defense raising an issue of fact as to plaintiff's right to recover is set up, a summary judgment must be denied."); see also *First Community Bank of West Frankfort v. Ohio Casualty Insurance Co.*, 154 Ill. App. 3d 133, 137 (1987) ("[Defendant] has put forth a defense raising a genuine issue of a material fact as to [plaintiff's] right to recover from her. Because a controversy does exist, the granting of summary judgment was improper.").

¶ 69    As discussed in greater detail above, in this case, we find that there remain questions of material fact as to at least one of the defenses raised by QED, that of the voluntary payment doctrine, which, if applicable, could bar SIH from recovery on all counts contained in its verified second amended complaint. Because Illinois law makes clear that summary judgment is inappropriate where a defendant raises a defense that presents an issue of material fact as to the plaintiff's right to recovery, we must therefore find that the circuit court committed reversible error when it found that SIH was entitled to summary judgment as a matter of law on counts I, II, and VI.

¶ 70                                III. CONCLUSION

¶ 71    We find that QED failed to argue judicial estoppel in the circuit court and therefore the issue is forfeited on appeal. Additionally, because there is no privity between SIH and any party

26

to the federal criminal case, the circuit court did not err in declining to grant summary judgment on the grounds of collateral estoppel. Further, because there are remaining questions of fact related to whether or how the voluntary payment doctrine would apply to this case, we find that the circuit court's denial of QED's motion for summary judgment on counts I, II, IV, V, and VI was appropriate. Finally, because the application of the voluntary payment doctrine would be an affirmative defense blocking recovery on counts I, II, and VI, should it apply, we find that the grant of summary judgment on these counts was improper.

¶ 72    Therefore, we must reverse and remand this case to the circuit court to answer the remaining questions of fact highlighted above, as well as any additional questions of fact or law that arise during the remainder of this litigation.

¶ 73    Reversed and remanded with directions.